## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL J. MASSEY,** | ) | **CASE NO.  4:04 CV 1538** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **VILLAGE OF CRESTON, et al.,** | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| **Defendants.** | ) | |

This matter is before the Court upon Defendants' Motion for Summary Judgment (Dkt. #13).   In this 42 U.S.C. § 1983 action, Plaintiff, Michael Massey ("Massey") alleges that his termination of employment and non-promotion to the position of Chief of Police was in retaliation for Plaintiff's exercise of his rights under the First Amendment.   Defendants Mark Suppes ("Suppes"), Kathleen Slater ("Slater"), Eric Schreiber ("Schreiber"), Elizabeth Johnson ("Johnson"), Harold Flory ("Flory"), and Ronald White ("Mayor White") are sued solely in their individual capacities.   The instant motion seeks summary judgment on the issues of legislative immunity as well as qualified immunity.

## I. FACTS[1]

Defendant, the Village of Creston ("the Village"), employed Plaintiff as Acting Police Chief from September 2003 to March 1, 2004.   (Dkt. #15, Massey Affidavit ¶¶ 12, 103). Defendants[2] Suppes, Slater, Schreiber, Johnson, and Flory are members of the Council of the Village of Creston (the "Council").   (Dkt. #1, Complaint ¶¶ 10–19)  Defendant Mayor White is Mayor of the Village.  (Dkt. #13, Ex. A ("White Affidavit") ¶ 2).

### *Hiring of Plaintiff*

On June 5, 2003 Larry Carver ("Carver") became Acting Police Chief of the Village of Creston, replacing Defendant Flory who had vacated the position of Police Chief of the Village of Creston.  (White Affidavit ¶ 6; Dkt. #15, Carver Affidavit ¶ 1).  In June 2003 then-Acting Police Chief Carver recommended to Mayor White and the Village Council members,—defendants Slater, Johnson, and Schreiber included—that they hire Plaintiff as a part time police officer for the Village.   (White Affidavit ¶ 6; Dkt. #13 at 2; Carver Affidavit ¶ 5).   Carver conducted a background check of Plaintiff prior to this recommendation.[3]  (Carver Affidavit ¶ 6–8).  During the background check Carver discovered Plaintiff had been terminated from the Ohio State Highway Patrol.  (Carver Affidavit ¶ 8).

---

[1]The following facts are undisputed, unless otherwise noted.

[2]Hereafter, the term "Defendants" refers to Suppes, Slater, Schreiber, Johnson, Flory and Mayor White collectively, unless otherwisenoted.

[3]Defendants do not dispute that Carver conducted a background check; however, Defendants assert evidence from Carver's affidavit is biased due to Carver's friendship with Plaintiff. (Dkt. #19 at 4).

Later, in August 2003 Council members received by anonymous mail the Ohio State Highway Patrol personnel records and disciplinary records concerning Plaintiff and his termination. (Massey Affidavit ¶ 9). The Village Council held a special executive session to discuss this matter. (Carver Affidavit ¶ 10–11; Massey Affidavit ¶ 9–11). The Council Members, including defendants Slater, Johnson and Schreiber, decided the Highway Patrol records were irrelevant to Plaintiff's current job performance as he was doing a good job for the Village as a police officer. (Carver Affidavit ¶ 11; Massey Affidavit ¶ 9–11). The special executive session, did not, however, clarify the reasons for Plaintiff's termination from the Ohio State Highway Patrol. (Dkt. #19, Affidavit of Mayor Ronald White ("Second White Affidavit") ¶ 7).

In September 2003 Carver left his position as Acting Chief of Police. (Carver Affidavit ¶ 13). Mayor White then appointed Plaintiff as Acting Chief of Police. (Carver Affidavit ¶ 14; White Affidavit ¶ 5). The Council of the Village of Creston, including Suppes, Slater, Schreiber, and Johnson, approved the appointment. (Massey Affidavit ¶ 12; White Affidavit ¶ 5).

### Investigation of Mark Suppes

In November 2003 Plaintiff conducted an investigation into an incident where individual Defendant and Council member Suppes was publicly intoxicated and engaged in disorderly conduct at a bar in Creston. (Massey Affidavit ¶¶ 29–32). Officer John D. Miller ("Officer Miller") informed Plaintiff that defendant Suppes was publicly intoxicated and engaged in disorderly conduct. (Massey Affidavit ¶¶ 29–30; Dkt. #15, Ex. 3 Statement of

3

Officer John D. Miller).   Suppes, on November 12, 2003, came to Plaintiff's office and stated to Plaintiff that he "would be gone soon" from his position as Police Chief of the Village of Creston. (Massey Affidavit ¶ 33).

On November 17, 2003, Plaintiff informed Thomas Flynn, Law Director of the Village of Creston ("Law Director Flynn") and Mayor White that there was probable cause to believe that Suppes had committed several acts which constitute crimes under the laws of the State of Ohio. (Massey Affidavit ¶ 35).   Neither Law Director Flynn nor Mayor White disagreed that there was probable cause to believe that Suppes had committed criminal acts. (Massey Affidavit ¶ 36; Second White Affidavit ¶ 13).   Nevertheless, Law Director Flynn recommended that no charges be filed against Suppes, and no legal action was taken.  (Dkt. #15, Ex. 5, Letter from Law Director Flynn regarding Mark Suppes; Massey Affidavit ¶ 37).

During November and December 2003 Suppes continued to make statements that Plaintiff would not be allowed to continue as Acting Police Chief because of his investigation.   (Massey Affidavit ¶ 39).   During November and December 2003 individual Defendants and Council members Slater and Schreiber each made statements to the effect that it was inappropriate for Village police officers to investigate criminal acts allegedly committed by members of the Council.   (Massey Affidavit ¶ 40).   Also, during the week beginning January 9, 2004, Schreiber and Slater met at local restaurants and plotted Plaintiff's employment termination.[4]   (Massey Affidavit ¶ 51).

---

[4]Defendants dispute the interpretation of Suppes's, Slater's and Schrieber's conduct and statements. Dkt. #19 at 3–7.

4

***Investigation of Jason Flory***

In December 2003, Plaintiff conducted an investigation into the activities of Jason Flory, whom he suspected of committing an on-going theft by illegally tapping a water line and stealing water.  (Massey Affidavit ¶ 42).  Jason Flory was an employee of the Village, the son of Harold Flory, son-in-law of the Village Clerk, and close friend of Schreiber.  (Massey Affidavit ¶¶ 43–47).  On December 30 Plaintiff informed Law Director Flynn, Mayor White, and the County Prosecutor that there was probable cause to believe that Jason Flory had committed theft.  (Massey Affidavit ¶ 49).  On January 6, 2004 Mayor White and Law Director Flynn refused to take any legal action against Jason Flory and each of them refused to refer the matter to the County Prosecutor for further investigation or legal evaluation.[5] (Massey Affidavit ¶ 50).  No legal action was taken against Jason Flory.  (Id.).

***Investigation of Helen Uhler***

On February 26, 2004, Plaintiff notified the County Prosecutor and the news media of an assault committed by Village Clerk Helen Uhler.  (Massey Affidavit ¶ 96).

***The Selection Process***

Meanwhile, the Village had begun its selection process for Police Chief on September 16, 2003.  (White Affidavit ¶ 7).  Mayor White and two selection committees of the Village Council—the Village Personnel Committee and the Village Safety

_____

[5]Mayor White disputes this fact, stating "I personally accompanied [Plaintiff] to the ...Prosecutor's office regarding the incident with Mark Suppes and Jason Flory. We discussed these matters prior to going and I supported his decision."  (Second White Affidavit ¶ 13).

Committee—administered the selection process.  (White Affidavit ¶ 9).  These committees consisted entirely of Slater, Schreiber, Johnson, Flory, Mayor White and Jim Stebbens[6]. (Massey Affidavit ¶ 54).  Plaintiff took part in the Police Chief selection process along with a number of other applicants.  (White Affidavit ¶ 10).  The selection process required applicants to submit an application and attend an oral interview.  (Dkt. #15, Ex. 2).

Pursuant to O.R.C. § 737.15, the Council instituted a Chief of Police Hiring Process which included publication and posting of the notice of the Police Chief opening, giving a description of the position, salary range, eligibility requirements, a schedule of the events of the process and a description of the process itself.  (White Affidavit ¶ 9; Dkt. #15, Ex. 2). The Chief of Police Hiring Process contained, among other requirements, an educational requirement of both a minimum of 60 semester hours from an accredited university and a minimum five years experience as a police officer and five years of supervisory experience, preferably in police work.  (Dkt. #15, Ex. 2).  Plaintiff possessed all minimum qualifications. (Massey Affidavit ¶ 22).  Three of the applicants for the position of Chief of Police of the Village of Creston, including the Village Council's ultimate choice for Police Chief, Philip Carr, did not possess the minimum qualifications contained in the Hiring Process.  (Massey Affidavit ¶ 23).

The Village Safety and Personnel Committees conducted the oral interviews from January 17 to January 29, 2004.  (Massey Affidavit. ¶¶ 52–56, 59).  The interview and

---

[6]Jim Stebbens is not a named, individual Defendant.

6

scoring process was subjective; it gave room for individual opinion as to each person deciding point value for each category. (Massey Affidavit ¶ 62; Dkt. #15, Ex. 6, Scoring sheet for the Selection of the Chief of Police; Second White Affidavit ¶ 9). The Council could adjust points for those whom they felt were the best-qualified applicants in a specific area. (Second White Affidavit ¶ 9).

Upon completion of the oral interviews, Plaintiff did not make it as one of the top three applicants advancing to the next round of psychological, physical and drug test evaluations. (White Affidavit ¶ 10). Mayor White admitted to Plaintiff that the scoring had been manipulated by Defendants—the Council members on the selection committees—against Plaintiff to insure that Plaintiff was not one of the top three applicants in the process.[7] (Massey Affidavit ¶ 62–67).

In addition to his failure to score among the top applicants, the Defendants also based their decision to not appoint Plaintiff as permanent Police Chief upon Plaintiff's questionable moral character. (White Affidavit ¶¶ 11–13). Defendants found problems with Plaintiff's June 12, 2003 employment application and determined that Plaintiff had misinformed the Village of his correct address and marital status. (Id.) Defendants also determined that Plaintiff had lied in giving his reasons for leaving the Ohio State Highway

---

[7]Defendants dispute the interpretation of Mayor White's statement to Plaintiff. Mayor White states he merely told Plaintiff that the Council had the right to use the point system to award points to whom they considered the best applicant, and that the Council had complete control over for whom and how they would award points. (Second White Affidavit ¶ 14).

Patrol.  (Id.).  Additionally, Defendants disapproved of Plaintiff's "sexual bravado," which included boasts regarding his sexual conquests.  (White Affidavit ¶¶ 11–12).

Plaintiff's June 12, 2003 application with the Village for patrolman contained several "problem areas."  (White Affidavit ¶ 13).  Plaintiff misinformed the Village of his correct address and marital status.  (White Affidavit ¶ 13).  Plaintiff also noted that he left the State Highway Patrol due to a "union dispute," but Mayor White later discovered that Plaintiff was terminated for violating the rules and regulations of the Ohio State Highway Patrol for conduct unbecoming of an officer.  (White Affidavit ¶ 13).

Then, on February 3, 2004 the Village retallied the point totals for the position of Chief of Police, and Plaintiff became one of the top three applicants.  (Massey ¶ 81).  Philip Carr, however, was not one of the top three applicants.  (Massey ¶ 82).

On February 5, 2004 Schreiber, Suppes and Slater requested a special meeting of the Council.  (Massey Affidavit ¶ 84; Dkt. #15, Ex. 7, Request for Special Council Meeting). The Council, then, held a special meeting at 9:00am on Saturday February 7, 2004 (the "Special Meeting").  (Massey Affidavit ¶ 85; Dkt. #13, Ex. B, Village of Creston Council Minutes ("Minutes")).  The Council published notice of the Special Meeting on the day of the meeting in the local newspaper. (Massey Affidavit ¶ 86).

Mayor White and all other individual Defendants attended the meeting as members of the Council.  (Minutes at 1).  During the Meeting, Law Director Flynn reported that the Chief of Police Hiring Process approved by the Council on November 3, 2003 contained an error in the description of Chief of Police qualifications.  The Hiring Process passed in

November 3, 2003 stated the following:

> The minimum educational/vocational requirements are as follows:
>
> 1.  High school graduate together with a minimum of 60 semester credits from an accredited university and five years supervisory/managerial experience.
>
> 2.  Must possess an Ohio state certification from OPOTA as a police officer with a minimum of five years of full-time experience as a police officer and five year of supervisory experience, preferably in police work.

(Dkt. #15, Ex.2; Dkt. #13, Ex. B.).   Law Director Flynn explained that the Administrative Rules Committee had met on September 15, 2003 and decided they wanted this item to read as follows:

> High school graduate together with a minimum of 60 semester hours from an accredited university and five year supervisory/managerial experience OR high school graduate together with five years patrol experience and five years supervisory/managerial experience.

(Minutes at 1).   Law Director Flynn then "reported that no one had caught this mistake until a couple of days ago.   Three Council members [Slater, Schreiber and Suppes] decided that this mistake needed to be corrected and that is why [they called the Special Meeting]."   (Id.). Slater, then, made a motion, seconded by Schreiber, to amend and correct the language in the Police Chief Hiring Process, also making the amendment retroactive back to November 3, 2003.   (Id.).   Council member Helen Gray Arndt opposed the motion.   (Id. at 2).   She argued with Mayor White, Law Director Flynn and Slater over the amendment, accusing the Council of "back stabbing," passing around "smut" regarding Plaintiff, and engineering via the instant amendment, Plaintiff's absence from the top Police Chief candidates.   (Id. at 2–3).

The amendment to retroactively change the Hiring Process passed by a vote of 4 to

2.  Schreiber, Johnson, Slater and Suppes voted in favor of the amendment.  Flory and Arndt voted against the amendment.  (Minutes at 3).  As a result of the amendment, Plaintiff, after another re-tally of points, was no longer one of the top three cnadidates.  (Massey Affidavit ¶ 89).

On March 1, 2004, the Village completed its selection process for Chief of Police and  selected Philip Carr as permanent, full-time Chief of Police.  (White Affidavit ¶ 7).  That same day, the Council, including Suppes, Schreiber, Slater, Johnson and Flory voted with Mayor White's approval to terminate Plaintiff's employment both as a Village police officer and as Acting Chief of Police.  (Massey Affidavit ¶¶ 97-101).  Also, on March 1, 2004 Mayor White approached Plaintiff and stated to him that he had done a good job as Acting Chief of Police and his termination was not related to his job performance.  (Massey Affidavit ¶ 101).  (Meanwhile, on February 4, 2004 Mayor White had written Plaintiff a letter of recommendation extolling his accomplishments as the Vilalge Chief of Police, noting that Plaintiff was "extremely professional."  (Dkt. #15, Ex. 8)).  Sometime after March 1, 2004, the Village hired Philip Carr as Police Chief.  (Massey Affidavit ¶ 103).

On August 2, 2004, Plaintiff filed an action pursuant to 42 U.S.C. § 1983 in this Court suing the Village of Creston as well as Suppes, Slater, Schreiber, Johnson, Flory and Mayor White in their individual capacities and alleging a claim of retaliation in violation of the First Amendment.  (Dkt. #1).  The Court suspended discovery and ordered the parties to brief the issue of Qualified Immunity.  (Dkt. #11).  Defendants then filed the instant Motion for Summary Judgment (Dkt. #13) on the issues of legislative immunity and qualified immunity.

## II. STANDARD OF REVIEW

Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56 (c). "Rule 56 (c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In considering such a motion, the court must review all of the evidence in the record. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); accord Graham-Humphreys v. Memphis Brooks Museum of Art, Inc., 209 F.3d 552, 556-57 n.7 (6th Cir. 2000). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

"A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (quoting FED. R. CIV. P. 56 (c)). The movant meets this burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Clayton v. Meijer, Inc., 281 F.3d 605, 609 (6th Cir. 2002) (quoting Celotex, 477 U.S. at 324-25). The non-movant then "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

"The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Anderson, 477 U.S. at 250). "A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250.

## III. LAW AND ANALYSIS

### Legislative Immunity

Defendants first assert they are entitled to absolute immunity in their motion for summary judgment because their acts—the decisions to not promote Plaintiff and to terminate of Plaintiff's employment—were legislative in nature. Local legislators are "absolutely immune from suit under § 1983 for their legislative activities." Bogan v. Scott-Harris, 523 U.S. 44, 49 (1998). This protection extends "'to all actions taken in the sphere of legitimate legislative activity.'" Tucker v. City of Richmond, Ky., 388 F.3d 216, 224 (6th Cir. 2004) (quoting Bogan, 523 U.S. at 54) (internal quotations omitted). "Whether an act

is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." Bogan, 523 U.S. at 55.  For example, "passing an ordinance is…an action taken in official legislative capacity." Tucker, 388 F.3d at 224.

Employment decisions, on the other hand, are not actions taken in an official legislative capacity; they are generally, administrative actions.  See, e.g., Forrester v. White, 484 U.S. 219, 229–30 (1988) ("employment decisions are administrative functions for which judges should not be given absolute immunity"); Chateaubriand v. Gaspard, 97 F.3d 1218, 1220–21 (9th Cir. 1996) ("courts generally consider legislators' employment and personnel decisions to be administrative, rather than legislative, acts"); Rateree v. Rockett, 852 F.2d 946, 950 (7th Cir. 1988) ("employment decisions generally are administrative, regardless whether made by a judge or a legislature").

An exception to this rule exists for employment decisions "'accomplished through traditional legislative functions' such as policymaking and budgetary restructuring that 'strike at the heart of the legislative process.'" Acevedo-Garcia v. Vera-Monroig, 204 F.3d 1, 8 (1st Cir. 2000) (quoting Rateree, 852 F.2d at 950–51).  See, e.g., Alexander v. Holden, 66 F.3d 62, 65 (4th Cir. 1995) (finding budget decision to eliminate position, rather than terminate specific employee was legislative); Rateree, 852 F.2d at 949 (finding elimination of jobs from city budget, unlike firing of specific individuals, was legislative).  Courts, therefore, in applying legislative immunity must distinguish between administrative and legislative employment decisions.  See Canary v. Osborn, 211 F.3d 324, 329 (6th Cir. 2000) (differentiating "personalized assessments of individual employees" from "an impersonal

13

budgetary analysis" in finding that School Board's employment decision was administrative); In re Montgomery County, 215 F.3d 367, 373 (3d Cir. 2000) ("Firing a particular employee is a personnel decision that does not involve general policy making."); Acevedo-Garcia v. Vera-Monroig, 204 F.3d 1, 8 (1st Cir. 2000) (finding acts which targeted specific individuals rather than positions were administrative rather than legislative).

In Bogan, the Supreme Court held that a city ordinance eliminating the position of director of the social services department from the city budget was a legislative act to which legislative immunity applied. Bogan, 523 U.S. at 44. The Court found that elimination of a position from the city's budget was legislative in nature since it reflected "a discretionary, policymaking decision implicating the budget priorities of the city." Id. at 45. The Court differentiated the decision from "the hiring or firing of a particular employee" since the elimination of a position in a budget "may have prospective implications that reach well beyond the particular occupant of the office." Id. Thus, the Supreme Court in Bogan outlined three factors distinguishing administrative acts from legislative acts: (1) whether an action "implicat[es] budgetary priorities;" (2) whether an action "involve[s] the termination of a position;" and (3) whether an action has "prospective implications" that reach well beyond a particular individual." See Canary v. Osborn, 211 F.3d 324 at 330–31 (quoting Bogan, 523 U.S. at 44).

Unlike the ordinance in Bogan, the decisions of the Council to not promote and ultimately terminate Plaintiff made as a result of the Chief of Police Hiring Process and the Special Meeting do not "bear all the hallmarks of traditional legislation." Bogan, 523 U.S.

14

at 45; See Canary v. Osborn, 211 F.3d 324 at 330–31. First, the decisions to not promote and terminate Plaintiff as well as the actions taken by the Council during the Hiring Process and Special Meeting fail to "implicat[e] the budgetary priorities" of the Village. Bogan, 523 U.S. at 45. On the contrary, the Hiring Process and Special Meeting were devoted to the subject of selecting an individual for the position of Chief of Police. Moreover, during the Hiring Process, the Defendants as members of the selection committees made personalized assessments of the candidates. See Canary, 211 F.3d at 330 ("[T]he Board was making personalized assessments of individual employees, not engaging in an impersonal budgetary analysis of various positions."). Defendants argue that the Council's decision to only submit the top three applicants to psychological and polygraph testing in an effort to protect Village resources evidences that the Hiring Process implicated the Villages's budgetary constraints. The record, however, does not reflect that this "budgetary constraint," affected the Council's decision of whom would assume the Chief of Police position and it certainly is not comparable to the budgetary constraints discussed in Bogan which concerned the need to eliminate an entire position due to financial reasons. See Bogan, 523 U.S. at 45.

Second, the Chief of Police Hiring Process and the Special Meeting did not involve the termination of a position. See id.; Canary, 211 F.3d at 330. And, third, the decision to terminate Plaintiff's employment and deny Plaintiff promotion to permanent Chief of Police did not have prospective implications reaching beyond the particular occupant of the Police Chief position. Bogan, 523 U.S. at 45; Carary, 211 F.3d at 330. The Council's decisions solely concerned who would occupy the position of Chief of Police. See Canary, 211 F.3d

15

at 330.

Accordingly, the Court finds that the Defendants' actions as Council members in terminating Plaintiff's employment and in declining to select him as the permanent Chief of Police are administrative acts to which absolute legislative immunity does not apply.

### *Qualified Immunity*

Section 1983 provides a cause of action against any person, who, under color of state law, deprives an individual of any right, privilege, or immunity secured by the Constitution and federal law.  See 42 U.S.C. § 1983.  When officials are sued in their individual capacities, they may be protected from liability for damages if their alleged wrongful conduct was committed while they performed a function protected by qualified immunity.  Cagle v. Gilley, 957 F.2d 1347, 1348 (6th Cir. 1992).

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  Mitchell v. Forsyth, 472 U.S. 511, 526.  The privilege is an "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  Id.  Consequently, qualified immunity questions must be resolved at the earliest possible stage in litigation.  Saucier v. Katz, 533 U.S. 194 (2001).

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341.  Government officials are entitled to qualified immunity when performing discretionary functions as long as the conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person

16

would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Whether a party is entitled to qualified immunity is typically a question of law for the court to decide. Brandenburg v. Cureton, 882 F.2d 211, 215 (6th Cir.1989). When the facts on which the question of immunity turns are in dispute, however, it is for the trier of fact to make the factual findings underlying resolution of the qualified immunity issue. Gardenhire v. Schubert, 205 F.3d 303, 311 (6th Cir.2000).

In order to prevail in a Section 1983 action against a government official, a plaintiff must overcome qualified immunity by establishing that the official violated a "clearly established" constitutional right and "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Consequently, a plaintiff opposing qualified immunity must answer this threshold question: whether the facts, taken in the light most favorable to the plaintiff, demonstrate that an official's conduct violated a constitutional right. See Saucier, 533 U.S. at 198; Crockett v. Cumberland Coll., 316 F.3d 571, 579 (6th Cir. 2003). If no constitutional right would have been violated were the allegations established, the Court must terminate the qualified immunity inquiry and dismiss the suit. See Saucier, 533 U.S. at 198. On the other hand, if the plaintiff answers the question in the affirmative, "the next, sequential step is to determine whether the right was clearly established." Id. With regard to this second step, the plaintiff must rely on either Supreme Court precedent, precedent from this Court, or cases from other courts which "point unmistakably to the unconstitutionality of the conduct and [are] so clearly foreshadowed by

17

applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional." Mumford v. Zieba, 4 F.3d 429, 432-33 (6th Cir.1993).  If the plaintiff fails to establish either the existence of a constitutional violation or that such a violation was clearly established, the Court must dismiss the action.

Accordingly, the Court shall first determine whether Plaintiff has presented sufficient facts to demonstrate that Defendants' conduct violated his constitutional rights.  Plaintiff contends that Defendants violated his First Amendment rights by terminating his employment and denying him promotion to the position of permanent Chief of Police in retaliation for Plaintiff's criminal investigations into the acts of a Village Council member, a Village employee and the Village Clerk.

"Retaliation by a government employer against an individual who exercises his First Amendment rights constitutes a First Amendment violation." Perry v. McGinnis, 209 F.3d 597, 604 (6th Cir. 2000) (citing Zilich v. Longo, 34 F.3d 359, 365 (6th Cir. 1994)).  The Sixth Circuit has a established a three-step process for evaluating a public employee's claim of unlawful retaliation in violation of the First Amendment.  See Taylor v. Keith, 338 F.3d 639, 643 (6th Cir. 2003).

> First, the employee must establish that his speech is protected. To accomplish this, the employee must show that his speech touches on a matter of public concern, Connick [v. Myers], 461 U.S. [138,]147 [(1983)], and demonstrate that his interest in the speech outweighs the government's countervailing interest in promoting the efficiency of the public service it provides as an employer. Pickering [v. Bd. of Educ.], 391 U.S. [563,] 574 [(1968)].  This determination is a question of law for the court to decide.  Connick, 461 U.S. at 148 n. 10.

> Second, the employee must show that the employer's adverse action would chill an ordinary person in the exercise of his First Amendment rights. Cockrel v. Shelby County Sch. Dist., 270 F.3d 1036, 1048 (6th. Cir. 2001).

> Finally, the employee must present sufficient evidence to create a genuine issue as to whether his speech was a substantial or motivating factor in the employer's decision to discipline or dismiss.  Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

Taylor, 388 F.3d at 643.  If the employee makes this showing, the government can avoid liability "by showing that it would have taken the same action even in the absence of the protected conduct."  Jackson v. Leighton, 168 F.3d 903, 909 (6th Cir. 1999).

Defendants argue that Plaintiff cannot establish the third element of his First Amendment retaliation claim.[8]  Defendants contend that Plaintiff's protected speech—the separate investigations of Council member Suppes, Village employee Jason Flory and Village Clerk Helen Uhler—was not a motivating factor in their decision to not promote Plaintiff and to terminate his employment.  Defendants assert that they would have chosen someone other than Plaintiff for the position of Police Chief regardless of the Plaintiff's protected

---

[8]Defendants apparently concede and the Court finds that Plaintiff can prove the first two elements of his First Amendment retaliation claim.  First, Plaintiff spoke out about criminal acts committed by Council member Suppes, Village employee Jason Flory and Village Clerk Helen Uhler.  Speech that "seek[s] to bring to light actual or potential wrongdoing or breach of public trust" by government employees and officials constitutes a "matter of public concern."  Connick, 461 U.S. at 148.  See Taylor, 338 F.3d at 644 (finding that police officer's incident report made in the course of his employment and alleging wrongdoing by a fellow officer was speech touching on a matter of public concern).  Additionally, Defendants assert no countervailing government interest.  Second, Defendants subjected Plaintiff to the following adverse actions: termination from Village employment and non-promotion to permanent Police Chief.  See Hoover v. Radabaugh, 307 F.3d 460, 466–67 (6th Cir. 2002) ("Termination is an adverse action that would chill speech in a person of ordinary firmness.")

19

speech.   Defendants also argue that rather than his protected speech, Plaintiff's lack of moral character was the motivating factor for his non-promotion and termination.   At the outset, the Court notes that when "defendants' intent is at issue, 'summary judgment is particularly inappropriate.'"   Hoover v. Radabaugh, 307 F.3d at 460, 467 (6th Cir. 2002) (quoting Marohnic v. Walker, 800 F.2d 613, 617 (6th Cir. 1986)); Bloch v. Ribar, 156 F.3d 673, 678 (6th Cir. 1998).   The Court, nonetheless, shall examine the sufficiency of evidence regarding retaliatory motive presented by Plaintiff.

In order to establish that protected speech was a substantial or motivating factor in a plaintiff's adverse treatment, a plaintiff must point to "specific, nonconclusory allegations reasonably linking [his] speech to employer discipline."   Bailey v. Floyd County Bd. of Educ., 106 F.3d 135, 144 (6th Cir.1997).   The plaintiff "may not rely on the mere fact that an adverse employment action followed speech that the [government] employer would have liked to prevent."   Id. at 145.   The question of causation is typically left to the jury, unless the employee has failed to present a genuine issue of fact as to whether his speech caused his discharge. Id.

To  support  his  burden,  Plaintiff,  first,  relies  on  direct  evidence  of  Defendants' motivation.   Regarding Defendant Suppes, Plaintiff provides evidence that Suppes on multiple occasions stated to Plaintiff that Plaintiff would be removed from his position as Police Chief because of Plaintiff's criminal investigation of Suppes.   See (Massey Affidavit ¶¶ 33, 39).   Regarding Defendants Slater and Schreiber, Plaintiff provides evidence that Slater and Schreiber each made statements to Plaintiff to the effect that it was inappropriate for Village

20

police officers to investigate criminal acts allegedly committed by members of the Council. Plaintiff provides evidence that Slater and Schreiber met and plotted Plaintiff's employment termination and non-promotion.  See (Massey Affidavit ¶¶  40, 51, 67).  Also, as direct evidence, Plaintiff presents a statement by Mayor White describing to Plaintiff how Council members manipulated the point tallies from the selection process so that Plaintiff was not one of the top three candidates.  See (Massey Affidavit ¶¶ 54, 100–101).

Defendants dispute the interpretation of these statements.  They argue that Plaintiff's affidavit is self-serving and takes such statements out of context.  See (Dkt. #19 at 3, 7–8). Defendants' interpretations of the above-referenced statements are, however, equally self-serving.  The Court concludes that this evidence presented by Plaintiff demonstrates a genuine issue of material fact as to Defendants Suppes, Slater, Schreiber, Johnson and Flory's motivation in voting to terminate Plaintiff's employment.

To prove the causation element of his retaliation claim, Plaintiff also relies on circumstantial evidence.  Proof an official's retaliatory intent rarely will be supported by direct evidence of such intent. See McDonald v. Hall, 610 F.2d 16, 18 (1st Cir.1979) (reversing the district court's dismissal of the plaintiff's claim, holding that it will often be difficult to support a claim requiring a showing of the defendant's state of mind with direct evidence in a complaint).  Accordingly, "claims involving proof of a [defendant's] intent seldom lend themselves to summary disposition."  Bloch, 156 F.3d at 682.  The immunity issue should not be resolved if there are factual disputes on which the issue of immunity turns such that it cannot be determined before trial whether the defendants' conduct violated

21

clearly established rights.  Hall v. Shipley, 932 F.2d 1147, 1154 (6th Cir.1991).

As circumstantial evidence of Defendants' motivation, Plaintiff relies on inferences drawn from the four month time span between his protected speech—the investigations of Suppes, Jason Flory and Helen Uhler—and his termination and non-promotion.  Plaintiff also relies on inferences from the pretextual nature of the reasons asserted by Defendants for Plaintiff's non-promotion and termination.

Defendants assert Plaintiff's non-promotion and termination resulted from Plaintiff's failure to score enough points to make the top three candidates in the selection process.  On February 3, 2004, a re-tally of the point totals resulted in Plaintiff becoming one of those top three applicants.  Two days later Schreiber, Suppes and Slater called a Special Meeting of the Council for the purpose of changing the qualification requirements for the Chief of Police position.  The Council, on February 7, 2004, voted to amend the qualification requirements and enforce the amendment retroactively.  Individual Defendants Schreiber, Johnson, Slater and Suppes voted in favor of the amendment.[9]  The amendment resulted in Plaintiff once again being removed from the list of top three candidates.  The Court finds that this course of events raises a genuine issue of material fact as the motivation of individual Defendants Schreiber, Johnson, Slater and Suppes in failing to promote Plaintiff and in voting to terminate Plaintiff's employment.

Defendants also assert that they terminated Plaintiff's employment due to his lack of

---

[9]The Court notes that Defendant Flory voted against the amendment.

22

moral character.   Defendants accuse Plaintiff of concealing his reason for discharge from the Ohio State Highway Patrol—termination for violation of the Rules and Regulations of the Ohio State Highway Patrol and two prior suspensions for conduct unbecoming an officer. Plaintiff denies he concealed the reasons for his termination.   The record reveals that Defendants were aware of and considered, during a special executive session, the circumstances surrounding Plaintiff's previous employment with the Ohio State Highway Patrol.   The record also reveals Defendants, nonetheless, chose to employ Plaintiff and later appoint him Acting Police Chief.   The Court finds that the evidence in the record sufficiently demonstrates a genuine issue of fact as to whether Defendants' reason for terminating Plaintiff was pretextual.   See Everson v. Board of Education of the School District of the City of Highland Park, 123 Fed Appx 221, 231 (6th Cir. Feb 18, 2005) (finding genuine issue of fact as to defendants motivation in terminating employee where defendants based the termination on employee's lack of credentials and employee presented evidence that defendants were aware of and did not question her credentials at the time she was hired).

Defendants also accuse Plaintiff of lying about his address and marital status in his employment application.   Plaintiff denies lying about his marital status and argues that the address on his application was the address used on all his public records to avoid retaliation. Additionally, Defendants assert they had concerns about Plaintiff's "sexual bravado."   They accuse Plaintiff of openly boasting of his sexual activity to Mayor White. The record, however, reveals that Mayor White during this same time period made statements to Plaintiff about the good job Plaintiff was doing.   Mayor White even wrote Plaintiff a letter of

reference extolling Plaintiff's accomplishment as the Village Chief of Police, noting that he was extremely professional.  Each party disputes the interpretation of alleged lies and alleged immoral behavior, plus some of Mayor White's statements contradict his own and Defendants' asserted disapproval with Plaintiff.  Thus, the Court also finds a genuine issue of fact as to whether Defendants' "moral" reasons for terminating Plaintiff are pretextual.

In summation, upon reviewing the parties' allegations and submitted evidence, the Court concludes that Plaintiff's affidavit and other submitted evidence create a genuine issue of material fact as to the nature of the Defendants' motivations for Plaintiff's termination and non-promotion.  Each individual Defendant is a Council member and voted on March 1, 2004 to terminate Plaintiff's employment, with the exception of Mayor White who approved the Council's decision.  The evidence presented by Plaintiff has demonstrated several instances of genuine issues of material fact respecting Defendants' motivation in deciding to terminate Plaintiff's employment.  First, Plaintiff presented evidence of threats made by Suppes to remove Plaintiff from his position due to his investigation of Suppes.  Also, Plaintiff presented evidence of similar threats by Slater and Schreiber.  Second, Plaintiff presented evidence of an admission that Defendants had manipulated the selection process for Chief of Police to disfavor Plaintiff.  Third, Plaintiff presented evidence of a somewhat narrow time span—four months—between his protected speech and his ultimate termination. Fourth, Plaintiff presented evidence demonstrating Defendants' reasons for terminating Plaintiff were pretextual: Defendants were aware of Plaintiff's prior employment record, Defendants disagree with Plaintiff over interpretation of Plaintiff's statements regarding his

24

address and marital status, and Defendants asserted dissatisfaction with Plaintiff contradicted his good approval from Mayor White.

The record before the Court, therefore, presents several genuine issues of material fact implicating Defendants' motivation for terminating and failing to promote Plaintiff.[10] See Montgomery v. Carter County, 226 F.3d 758, 771 (6th Cir. 2000) (concluding that where, on the basis of the record, a reasonable trier of fact could conclude that the municipal defendants acted for a reason that had "no connection however tenuous to some at least minimally plausible conception of the public interest," the defendants were not entitled to summary judgment on the basis of qualified immunity). Where, as here, a defendant's intent is at issue, "summary judgment is particularly inappropriate." Hoover v. Radabaugh, 307 F.3d 460, 467 (6th Cir. 2002) (quoting Marohnic v. Walker, 800 F.2d 613, 617 (6th Cir. 1986)).

It is the opinion of the Court that Plaintiff has put forth "specific, nonconclusory, factual allegations" that establish genuine issues of material fact as to whether Plaintiff's protected speech was a substantial or motivating factor in Defendants' decision to not promote and terminate Plaintiff's employment.  Consequently, there is a genuine issue of material fact as to whether Plaintiff can establish  the first prong of the qualified immunity analysis—whether Defendants' conduct violated Plaintiff's First Amendment right to be free from retaliation.  Summary judgment, therefore, is inappropriate.

_____

[10]The Court notes that Plaintiff's presented evidence implicates the retaliatory motivation of some individual Defendants more than others (i.e., the retaliatory threat by Suppes).  Nevertheless, the Court finds the series of genuine issues of fact implicate the retaliatory motivation of each Defendant who voted for or approved Plaintiff's termination.

Defendants, however, argue that summary judgment is still appropriate because Plaintiff cannot successfully demonstrate the second prong of the qualified immunity analysis: whether the alleged violation involved "clearly established constitutional rights of which a reasonable person would have known." Dickerson v. McClellan, 101 F.3d 1151, 1158 (6th Cir. 1996). "[C]learly established rights, for purpose of qualified immunity, are 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Hoover, 307 F.3d at 468 (quoting Harlow, 457 U.S. at 818). "A right is clearly established if a reasonable official would understand that what he is doing violates that right." Id.

The constitutional right not to be terminated or denied a promotion in retaliation for engaging in protected First Amendment activity has been clearly established law for decades. See Doyle, 429 U.S. at 274; Pickering, 391 U.S. at 563; Bloch,156 F.3d at 682; see also Hoover, 307 F.3d at 469 ("[A] reasonable official would know that terminating an employee with the motivation, even in part, of quieting the plaintiff's public speech…violates the Constitution.").

Defendants do not dispute this case law; rather Defendants argue that they are entitled to qualified immunity because they reasonably believed that their actions did not violate established statutory or constitutional rights.   See (Dkt. #13 at 10–11).   Defendants misunderstand the analysis for determining if a constitutional right is clearly established.   A defendant is not entitled to qualified immunity merely because he might have *reasonably believed* that, absent an improper motive, his conduct was "objectively valid."   Crawford-EL

26

v. Britton, 523 U.S. 574, 588–92 (1998) (finding that evidence of a defendant's subjective intent, while it may be relevant to the question of whether a constitutional right has been violated, is irrelevant to the question of whether a constitutional right is clearly established). The proper analysis requires that a reasonable official be able to understand that his actions violate a constitutional right. See Hoover, 307 F.3d at 468.

The Court concludes that, because the law is well established that retaliation by a government official against an employee for speaking on matters of public concern is unconstitutional, see id. at 469, Plaintiff meets the second prong of the qualified immunity analysis.

Plaintiff has successfully demonstrated that a genuine issue of material fact exists as to whether Defendants' conduct violated his constitutional rights to be free from retaliation for his exercise of First Amendment rights.  The Court additionally finds that such a constitutional right is clearly established.  Accordingly, summary judgment on the issue of qualified immunity is unwarranted.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Dkt. #13) is **DENIED**.  Defendants are not entitled to absolute legislative immunity nor qualified immunity.  A status conference is scheduled for October 31, 2005 at 9:30 a.m.

**IT IS SO ORDERED.**

 *s / Peter C. Economus*   **09/30/05**
**PETER C. ECONOMUS**
**UNITED STATES DISTRICT JUDGE**

27